UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
KAYLAN PEDINE,

                              Plaintiff,

      -v-

THE CITY OF NEW YORK, New York City Police
Department Officer CRAIG CAMPION (Shield No.
10113) in his individual capacity,

                              Defendants.
------------------------------------------------------------------x

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

**INDEX NO. 13-CV-1675 (CM) (SN)**

**ECF CASE**

> "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1997).
>
> "The First Amendment is often inconvenient. But that is beside the point. Inconvenience does not absolve the government of its obligation to tolerate speech." *Int'l Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 701 (1992).
>
> "A time comes when silence is betrayal." Rev. Martin Luther King, Jr., *Beyond Vietnam: A Time to Break Silence*, Apr. 4, 1967.

Plaintiff KAYLAN PEDINE, through her attorneys MARK C. TAYLOR and ROBERT M. QUACKENBUSH of Rankin & Taylor, PLLC, as and for her complaint, does hereby state and allege:

### PRELIMINARY STATEMENT

1. The New York City Police Department's stop-and-frisk policy is under siege, and its officers are apparently hyper-sensitive about it.

2. As plaintiff KAYLAN PEDINE unfortunately learned, one of "New York City's Finest" took it upon himself to criminalize ***even speaking about*** the NYPD's discriminatory stop-and-frisk policy.

1

3. In July of 2012, as Ms. PEDINE was standing on a Third Avenue sidewalk with friends, she observed two police officers – defendant NYPD Officer CRAIG CAMPION and another officer – walking on the sidewalk.

4. As Ms. PEDINE watched the officers walking around, she turned to her friends and told them, "I wish they would stop stop-and-frisk." She made her comments in calm, conversational tones to her friends, and they were not even directed at the police officers themselves.

5. Despite the fact that Ms. PEDINE's comments were obviously protected by the First Amendment, and in clear retaliation for the viewpoint she privately expressed to her friends, Officer CAMPION immediately placed Ms. PEDINE under arrest, handcuffed her, took her to a nearby police precinct, and caused her to be prosecuted for disorderly conduct.

6. Unbelievably, even though Ms. PEDINE was standing still on the sidewalk next to a planter when she made the apparently-offensive comments, Officer CAMPION issued Ms. PEDINE a criminal court summons for allegedly *blocking vehicular traffic*, N.Y. Penal Law § 240.20(5).

7. Because Officer CAMPION retaliated against Ms. PEDINE for her obviously-protected speech, and because Officer CAMPION's arrest was made without probable cause for any offense, Ms. PEDINE now brings this civil rights action through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. § 1983, for violations of her rights under the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States.

8. By reason of Officer CAMPION's actions, which were entirely consistent with the NYPD's custom and practice of using N.Y. Penal Law § 240.20(5) as a pretext to retaliate against

individuals whose speech they find offensive, Ms. PEDINE was deprived of her constitutional rights.

9. Accordingly, Ms. PEDINE seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

10. Plaintiff brings this action through 42 U.S.C. § 1983 and alleges violations of her federal constitutional rights. Because this matter arises under federal law and presents a federal question, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

11. All of the events described herein occurred in the County and State of New York, within the confines of this judicial district. Thus, pursuant to 28 U.S.C. § 1391(a)(2), this Court is the appropriate venue.

12. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

13. Plaintiff KAYLAN PEDINE is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

14. Ms. PEDINE is currently employed as a social worker and social justice organizer with American Jewish World Service.

15. Prior to working for American Jewish World Service, Ms. PEDINE was employed as a program director for an after-school program working with children with emotional and behavioral disturbances in Yonkers.

16. Ms. PEDINE then moved to Brooklyn and worked with a non-profit organization serving people with developmental and learning disabilities and their families. There, she worked as an assistant supervisor for a group home serving people with developmental disabilities.

17. Other than the incident described herein, Ms. PEDINE has never been arrested or had criminal charges lodged against her for any reason.

18. THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the CITY's law enforcement officials.

19. NYPD Officer CRAIG CAMPION (Shield No. 10113) was at all times relevant herein an employee or agent of defendant CITY, through its law enforcement agency, the NYPD.

20. Upon information and belief, on the night of July 6, 2012, Officer CAMPION was assigned to the NYPD's 17th Precinct.

21. Officer CAMPION is sued herein in his individual capacity.

22. Officer CAMPION's acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Ms. PEDINE's rights.

**STATEMENT OF FACTS**

23. The incident described herein occurred on the sidewalk in front of 493 Third Avenue in Manhattan at approximately 11:55 p.m. on July 6, 2012.

24. At approximately the time, date and location described above, Ms. PEDINE was standing outside of the Mercury Bar, talking with two of her friends.

25. At all times relevant to this action, Ms. PEDINE was standing on the sidewalk, next to a planter.

26. Below is a photograph, taken from Google Maps street view, which shows the sidewalk where Ms. PEDINE was standing and the planter she stood next to. At all times relevant herein, Ms. PEDINE was standing in approximately the same position as the man wearing a number "94" jersey in the photograph below. At no point did Ms. PEDINE ever wander into the street.



27. As Ms. PEDINE was standing and talking with friends, she observed an NYPD car pull up, and two police officers got out. Specifically, Officer CAMPION was the passenger of the car.

28. The two officers got out and began to walk on the sidewalk in front of Mercury Bar.

29. Seeing the officers, Ms. PEDINE turned to her friend standing nearby and told them, "I wish they would stop stop-and-frisk."

30. Ms. PEDINE directed her comment towards her friend, not the police officers.

31. Moreover, Ms. PEDINE used a calm and relaxed tone when she made the comment. She did not yell or raise her voice, and she did not approach the officers when making the comment.

32. Nevertheless, Officer CAMPION turned to face Ms. PEDINE and told her, "TURN AROUND."

33. Shocked at Officer CAMPION's order, Ms. PEDINE said words to the effect of, "Are you serious?"

34. In response, Officer CAMPION again ordered Ms. PEDINE to turn around, which she immediately did.

35. Officer CAMPION then rear-cuffed Ms. PEDINE.

36. While Officer CAMPION was rear-cuffing Ms. PEDINE, she asked the officer why she was being arrested, but the officer declined to explain the basis of the arrest.

37. Bystanders, including at least one of Ms. PEDINE's friends, immediately began protesting the arrest, telling the officers that she did not violate any laws at all.

38. In response, Ms. PEDINE told her friend to stop talking and that everything would be fine because she did not do anything wrong.

39. Officer CAMPION then put Ms. PEDINE into the back of the NYPD vehicle.

40. Once in the back of the car, Ms. PEDINE asked Officer CAMPION, "Can you please tell me why I am being arrested?"

41. Officer CAMPION replied, "DISORDERLY CONDUCT."

42. Ms. PEDINE responded, "Why? For saying the phrase *stop-and-frisk*?"

43. Officer CAMPION did not reply to Ms. PEDINE's question about what she did that allegedly constituted disorderly conduct.

44. The officers then took Ms. PEDINE to a nearby police station.

45. There, a female police officer took Ms. PEDINE into a bathroom and, ironically enough, frisked her.

46. Ms. PEDINE was then taken back to a cell, where she remained for slightly less than one hour.

47. Upon her release from custody, Ms. PEDINE was issued a criminal court summons which charged her with disorderly conduct *by blocking vehicular traffic*, N.Y. Penal Law § 240.20(5).

48. N.Y. Penal Law § 240.20(5) reads, "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [s]he obstructs vehicular or pedestrian traffic."

49. It was not until Ms. PEDINE appeared in criminal court on September 12, 2012 that she learned of the bogus factual allegations against her.

50. On the criminal court summons bearing docket number 2012SN083884, Officer CAMPION alleged Ms. PEDINE (1) was standing in the street, (2) in a bus lane, (3) blocking some undescribed form of vehicular traffic, and (4) refused orders to move.

51. Simply put, all of Officer CAMPION's allegations are complete falsehoods.

52. Ms. PEDINE was not standing in the street.

53. Ms. PEDINE was not standing in the bus lane.

54. Ms. PEDINE was not blocking any pedestrian or vehicular traffic whatsoever. She was standing still on the sidewalk, next to the planter.

55. Ms. PEDINE did not disobey any police orders, as the only order given to her by Officer CAMPION were those made incident to her arrest and handcuffing.

56. The only possible explanation for Ms. PEDINE's arrest was that it was made in direct retaliation for her comments concerning the NYPD's stop-and-frisk policy.

57. At the second court appearance on November 28, 2012, the charge was dismissed due to the facial insufficiency of the factual allegations to make out the charge of disorderly conduct.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against Officer CAMPION*)

58. Ms. PEDINE incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

59. At all times relevant herein, Ms. PEDINE was standing on the sidewalk and chatting with friends. Her comment regarding her opinion of the NYPD's stop-and-frisk policy was obviously protected by the First Amendment, and no reasonably competent police officer would believe otherwise.

60. Indeed, the Supreme Court has recognized that "[t]he First Amendment protects a significant amount of verbal criticism and challenge *directed at* police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1997) (emphasis added).

61. Here, however, Ms. PEDINE did not even direct her comments "at" the police officers. Instead, Officer CAMPION merely overheard comments Ms. PEDINE made to her friends. Nevertheless, apparently because Officer CAMPION found Ms. PEDINE's viewpoint to be offensive, the officer retaliated against her by arresting her and causing her to be prosecuted on trumped up charges which were based on Officer CAMPION's knowingly false statements.

62. In so doing, Officer CAMPION, under color of state law, deprived Ms. PEDINE of her rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth

Amendments to the United States Constitution, including but not limited to deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of her person, including but not limited to false arrest and false imprisonment; (b) freedom from interference with activity protected by the First Amendment; (c) freedom from retaliatory arrest; (d) freedom from retaliatory prosecution; (e) freedom from malicious prosecution; and (g) freedom from abuse of process.

63. Officer CAMPION's deprivation of Ms. PEDINE's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**
(*Against THE CITY OF NEW YORK*)

64. Ms. PEDINE incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

65. All of the acts and omissions by Officer CAMPION described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on July 6, 2012 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

66. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified Officer CAMPION's wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

67. The acts complained of were carried out by Officer CAMPION in his capacity as a police officer pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

68. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a. Applying an unconstitutionally vague and speech-restrictive interpretation of Penal Law § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic, when arresting persons are engaged in activity protected by the First Amendment, even where the alleged blockage of traffic is either brief and fleeting or entirely non-existent; and

    b. Failing to supervise, train, instruct and discipline police officers about the lawful scope of Penal Law § 240.20(5), both on its face and as applied to activity protected by the First Amendment.

69. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a. *Lambert v. City of New York*, 153046/12 (Sup. Ct., N.Y. Co). The plaintiff in *Lambert* was lawfully participating in a demonstration associated with the Occupy Wall Street movement when she heard an order to disperse. She attempted to comply with the order by finding the nearest point of exit, but, when none could be easily found, and when NYPD officers refused to answer her questions about which direction she should go to comply with the order, NYPD officers placed her under arrest and caused her to be charged with N.Y. Penal Law § 240.20(5).

    b. *Coleman v. City of New York*, 12-CV-2123 (DAB) (HP) (S.D.N.Y.). The plaintiff in *Coleman* was participating in five-minute long, site-specific work of performance art intended as a commentary on the various occupations found around Wall Street, entitled "Ocularpation: Wall Street." At approximately 7:00 a.m. on a weekday in the financial district, long before the sidewalks became crowded with workers, Coleman took off her shirt and began pretending to walk a dog as part of the performance. Despite the fact there were absolutely no pedestrians on the sidewalk to be blocked, officers arrested her and charged under Penal Law § 240.20(5), charges which were dismissed as being facially insufficient to support the charge.

    c. *Halfmann v. City of New York*, 12-CV-1403 (PAC) (S.D.N.Y.). The plaintiff in *Halfmann* was demonstrating blocks from the World Trade Center on the tenth anniversary of the attacks of September 11, 2001. During the memorial ceremony, Halfmann stood in the middle of Church Avenue, which at that time was turned into a pedestrian walkway. While occupying approximately 2.8% of the usable pedestrian path, Halfmann began giving a speech to passersby. During the speech, pedestrian traffic flowed free past Halfmann; absolutely no one had to walk around Halfmann to avoid walking into him. Nevertheless, officers approached and arrested him for

violating Penal Law §240.20(5), a charge that was dismissed as facially insufficient to sustain a prosecution.

d. ***Garcia v. Bloomberg***, 11-CV-6957 (JSR) (S.D.N.Y.). The *Garcia* plaintiffs represent a putative class of approximately 700 people arrested on the Brooklyn Bridge roadway as part of a march associated with the Occupy Wall Street movement. As the demonstrators marched over the pedestrian path of the Brooklyn Bridge, pedestrian traffic began to bottleneck near the entrance. In what initially appeared to be an effort to alleviate the bottleneck, NYPD officers led a group of marchers onto the vehicular roadway of the Bridge, then used orange netting to close off the entrance, thereby trapping the demonstrators on the Bridge. Despite obviously lacking the requisite intent or recklessness required under statute, and despite having themselves escorted the demonstrators onto the vehicular roadway, all of the demonstrators on the roadway were arrested and charged with violating Penal Law § 240.20(5).

e. ***Long v. City of New York***, 11-CV-5125 (SAS) (S.D.N.Y.); Colin Moynihan, *Judge to Police: Relax About the "Weed Man,"* N.Y. Times, Dec. 20, 2011, at A32. Joshua Long was repeatedly arrested in Manhattan while lawfully begging and promoting tolerance of marijuana use and marijuana users. Mr. Long would regularly stand on a sidewalk, conscious of staying out of pedestrians' way, and hold a sign reading, "Help! I Need Money for Weed!" Even during the times Mr. Long was not arrested or issued a summons for violating Penal Law 240.20(5), he was regularly ordered by police to "move along" on the pretext he was allegedly blocking pedestrian traffic when, in fact, he was doing no such thing. Mr. Long moved for a preliminary injunction, a motion which was resolved when Mr. Long and the CITY entered into a stipulation, approved by this Court, which read:

> Defendant the City of New York, shall make best efforts to ensure that all New York City Police Department officers assigned to patrol within the territorial boundaries of the Midtown North or Midtown South Precincts (the "Area") will not order, direct, or otherwise communicate to plaintiff Joshua Long that he must move along, leave, vacate, disperse, or otherwise remove himself from the area when he is standing lawfully and peacefully on a public sidewalk, holding a sign or otherwise communicating with passersby. The City of New York's best efforts shall include, without limitation, ensuring that the substance of this Order is communicated to all officers that work in the Area.

(*See* Docket Entry No. 31, Stipulation and Order dated December 19, 2011).

f. ***Hardeman v. City of New York***, 11-CV-3424 (RJH) (S.D.N.Y.); Colin Moynihan, *After Panhandler Says Police Harassed Her, a Judge Tells Them to Stop*, N.Y. Times, Aug. 30, 2011, at A18. The plaintiff in *Hardeman* was repeatedly arrested on Fifth Avenue and charged with violations of Penal Law § 240.20(5) in response to her passive panhandling activity. Evidence submitted in support of Ms. Hardeman's application for a temporary restraining order and preliminary injunction against further arrests showed that, when she panhandled on Fifth Avenue, she occupied a

11

mere 20 inches of a 16 foot wide sidewalk, which is only 5.2% of the width of the sidewalk. (*See* Affidavit of Sojourner Hardeman, Docket Entry No. 14-1). As a result of the Hardeman litigation, the Court approved of a stipulation which resolved the TRO application, as follows:

  i. The NYPD agreed to re-train members of the Midtown North Precinct by reading the following command at roll call several times per week for several weeks: "The Department reminds you that… New York Penal Law 240.20(5) requires a ***real*** obstruction of vehicular or pedestrian traffic." (*See* Docket Entry No. 17) (emphasis added).

  ii. The City of New York agreed not to arrest or issue a summons to Ms. Hardeman "absent probable cause that she has engaged in criminal activity or committed a criminal offense or violation." (*Id.*)

Given that the City of New York had a pre-existing obligation not to arrest Ms. Hardeman without probable cause, the stipulation resolving the TRO application is a tacit acknowledgment the NYPD had repeatedly misapplied Penal Law § 240.20(5) against Ms. Hardeman as she engaged in passive panhandling, an activity which is clearly protected by the First Amendment.

g. ***Reshke v. City of New York***, 11-CV-2198 (AKH) (S.D.N.Y.); ***Ferracane v. City of New York***, 11-CV-6992 (AKH) (S.D.N.Y.). Members of the NYPD's Gang Intelligence Unit made scores of arrests at the 2010 Puerto Rican Day Parade of persons engaged in First Amendment activity by gathering and celebrating their cultural heritage in New York's largest annual parade. The police made these arrests upon the pretext such persons were blocking pedestrian traffic at the parade and for the sole purpose of interrogating the arrestees about suspected links to local gang activity. All fourteen of the *Reshke* and *Ferracane* plaintiffs had their criminal charges dismissed, most of them on the grounds of the facial insufficiency of the allegations to support a charge of Penal Law § 240.20(5).

h. ***Acevedo v. City of New York***, 10-CV-514 (HB) (S.D.N.Y.). Same as *Reshke* and *Ferracane*, except the eight *Acevedo* plaintiffs were arrested at the 2009 Puerto Rican Day Parade.

i. ***Callaghan v. City of New York***, 07-CV-9611 (PKC) (JLC) (S.D.N.Y.). All of the *Callaghan* plaintiffs were arrested, some of them multiple times, in retaliation for their participation in Critical Mass bicycle rides on the last Friday of every month, activity which this Court has held is expressive conduct within the meaning of the First Amendment. Many of the *Callaghan* plaintiffs were arrested while lawfully riding their bicycles on City streets, and many of those people were charged with violating Penal Law § 240.20(5). The *Callaghan* plaintiffs alleged that they could not have been "blocking" traffic because, as cyclists obeying relevant traffic laws, they ***were*** traffic.

    j. ***Dunlop v. City of New York***, 06-CV-0433 (RJS) (S.D.N.Y.). The plaintiff in the *Dunlop* matter was arrested while observing arrests of Critical Mass bicycle riders (*see supra*) during the 2004 Republican National Convention and was charged with violating Penal Law § 240.20(5), despite the fact there was no traffic at all around him at the time of his arrest. The act of observing arrests occurring in public is activity protected by the First Amendment, yet the police disregarded Mr. Dunlop's rights and wrongfully arrested him even though there he was not even arguably blocking vehicular or pedestrian traffic.

    k. ***MacNamara v. City of New York***, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.). The *MacNamara* plaintiffs' cases were consolidated from no less than 44 civil cases related to the over 1800 arrests at the 2004 Republican National Convention. Nearly all of the *MacNamara* plaintiffs were engaged in lawful activity protected by the First Amendment, but, despite that fact, hundreds of them were arrested for violating Penal Law § 240.20(5) when they were not actually blocking any traffic whatsoever. *See MacNamara v. City of New York*, 275 F.R.D. 125, 135 (S.D.N.Y.2011).

70. The allegations in the above-referenced matters are hereby incorporated by reference into this complaint.

71. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Raymond Kelly.

72. All of the above-described acts by Officer CAMPION deprived Ms. PEDINE of federally protected rights, including but limited to the constitutional rights enumerated in paragraph "62" above.

73. The CITY knew or should have known that the acts alleged herein would deprive Ms. PEDINE of her rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

74. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or

customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

75. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, Officer CAMPION felt empowered to arrest Ms. PEDINE for violating Penal Law § 240.20(5) even where it was obvious she was doing nothing that would constitute the blocking of traffic, where it was also obvious she was engaged in activity protected by the First Amendment when speaking to her friends about her opinion of the NYPD's stop-and-frisk policy, and where it was also obvious that her protected speech was not made "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" as required by the disorderly conduct statute.

76. Ms. PEDINE's injuries were a direct and proximate result of the CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers in meaning and lawful scope of Penal Law § 240.20(5), particularly where applied to activity protected by the First Amendment.

77. As such, the CITY's policies, practices, omissions and failures described above were the moving forces behind the violations of Ms. PEDINE's constitutional rights.

## JURY DEMAND

78. Ms. PEDINE demands a trial by jury in this action on each and every one of her damage claims.

*WHEREFORE*, Ms. PEDINE demands judgment against THE CITY OF NEW YORK and Officer CAMPION individually and jointly and prays for relief as follows:

a. That she be compensated for violation of her constitutional rights and the harms which naturally resulted from the violations of her rights; and

b. That she be awarded punitive damages against Officer CAMPION; and

c. That she be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

Dated: New York, New York
March 13, 2013

Respectfully submitted,

/s/
By: _____
Mark C. Taylor
Robert M. Quackenbush
Rankin & Taylor, PLLC
*Attorneys for the Plaintiff*
11 Park Place, Suite 914
New York, New York 10007
t: 212-226-4507
f: 212-658-9480